J-A04004-26

2026 PA Super 86

| | | |
|---|---|---|
| MATTHEW GREGRO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARITZA C. GONZALEZ | : | No. 1101 MDA 2025 |

Appeal from the Order Entered July 30, 2025
In the Court of Common Pleas of Berks County
Civil Division at No(s):  21 2021

BEFORE:  PANELLA, P.J.E., KING, J., and LANE, J.

OPINION BY PANELLA, P.J.E.:                     **FILED: APRIL 27, 2026**

Matthew Gregro ("Father") appeals from the amended custody order entered by the Court of Common Pleas of Berks County on July 30, 2025, that awarded him supervised physical custody of his five-year-old daughter, K.G., while awarding Maritza C. Gonzalez ("Mother") sole legal custody and primary physical custody.  In addition, Father challenges the provisions of the July 30, 2025 order that prohibited the parties and their attorneys from, *inter alia*, speaking or communicating publicly "about this case including, but not limited to, print or broadcast media, online or web-based communications."  Order, 7/30/25, at 1.  After careful review, we affirm, in part, and reverse, in part.

The relevant facts and procedural history of this appeal are as follows.  The parties' relationship began in 2015, and they never married.  **See** N.T., 7/3/25, at 88, 106, 115, 198.  At all times relevant to this case, they have resided separately in Reading, Pennsylvania.  **See id.** at 27, 88, 174-75, 182-

83. The parties each have several children from other relationships who are not directly implicated in this appeal, but K.G. is their only shared child. *See id.* at 27, 136-37.

Berks County Children and Youth Services ("BCCYS") became involved with the family in May of 2020 after it received a report alleging that Mother tested positive for opiates at the time of K.G.'s birth. *See id.* at 156. BCCYS implemented a thirty-day safety plan and no further action was taken. *See id.* BCCYS investigated another report in March of 2021, which alleged that K.G. had been physically injured while left unattended in Father's care. *See id.* at 154-56, 163. BCCYS ultimately validated this report. *See id.*

The certified record reflects that the parties' relationship was volatile and included multiple instances of domestic violence. *See id.* at 115-23. Between April of 2020 and June of 2023, Mother filed six protection from abuse ("PFA") petitions against Father, while Father filed one PFA petition against Mother in the same time frame. *See* Father's Exhibits 25-31. The only PFA order that was extended past the initial hearing was the one filed against Father on July 29, 2022, which expired by agreement in March of 2023. *See* Father's Exhibit 30. In July of 2022, the parties' relationship ended after an incident wherein Father strangled Mother and damaged her trachea. *See id.* at 115-19, 198.

Since it is relevant to our disposition, we note that Father has a significant criminal history, which includes prior convictions on federal charges

involving illegal transportation of firearms as well as Pennsylvania state offenses for simple assault and driving under the influence ("DUI"). *See id.* at 31-32, 63-65, 88-90, 101-02. Mother further testified that Father was regularly involved in the illegal sale of controlled substances, including cocaine, methamphetamines, and marijuana from his residence. *See id.* at 109-12.

Father initiated the underlying custody proceedings in March of 2021. The court entered a final custody order on December 13, 2021 ("existing custody order"), which awarded the parties shared legal custody, Mother primary physical custody, and Father partial physical custody. Specifically, Father's partial physical custody award included one overnight per week from Wednesdays at 6 p.m. to Thursdays at 2:30 p.m., along with Sundays from 3 p.m. to 6 p.m. *See id.*

On June 2, 2024, Father filed a petition to modify the existing custody order requesting sole physical custody of K.G. *See* Petition for Modification of Custody Order, 6/2/24, at ¶¶ 7-8. The court held a hearing on July 3, 2025, at which time K.G. was five years old. Father testified on his own behalf and presented the testimony of his aunt, Susan Gonzalez ("Ms. Gonzalez"); his twenty-two-year-old son, Case Gregro ("Mr. Gregro"); and Daniel Kozack, BCCYS caseworker. The court also admitted thirty-one documentary exhibits proffered by Father, which included pictures, text messages, and docket summaries from the aforementioned PFA matters. Mother appeared *pro se*

and testified on her own behalf. Because of Father's "demeanor" at the hearing, the court requested the presence of an additional deputy sheriff in the courtroom. Opinion, 7/11/25, at 10.

By opinion and order dated July 10, 2025, and entered on July 11, 2025, the trial court awarded Mother sole legal and primary physical custody of K.G. *See* Order, 7/11/25, at 1-2; *see also* Opinion, 7/11/25. The court awarded Father supervised physical custody every Sunday from 11 a.m. to 6 p.m. at his residence. *See* Order, 7/11/25, at 4. The court also ordered that Father would be solely responsible for the costs of the professional supervisor. *See id.* at 5.

After the trial court rendered its decision, Father posted twice on Facebook about the case, wherein he (1) expressed his displeasure with the court's decision; (2) repeatedly disparaged Mother; (3) extensively detailed the evidence presented at the hearing; and (4) specifically named and pictured K.G. *See* Exhibit, 8/1/25. Thereafter, on July 30, 2025, the trial court supplemented the July 11, 2025 custody order by including additional provisions prohibiting the parties and their respective attorneys from speaking publicly about the case ("gag order"). *See* Order, 7/30/25 at 1-2 ("This order shall be construed as a supplement to the final custody order dated July 10, 2025 and shall be read together with the final custody order . . . such that the final custody order . . . and this supplement . . . are construed as one order.") (unnecessary capitalization omitted); *see also* 42 Pa.C.S.A. § 5505

("Modification of orders") (providing "a court upon notice to the parties may modify or rescind any order within 30 days after its entry, notwithstanding the prior termination of any term of court, if no appeal from such order has been taken or allowed.").

On August 11, 2025, Father filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  The trial court filed its Rule 1925(a) opinion on September 4, 2025.

On appeal, Father presents the following issues for our review:

1. Did the trial court err in determining that the testimony of BCCYS weighed only against Father when the testimony of BCCYS indicated that Mother had tested positive for narcotics during at least two (2) of her pregnancies?

2. Did the trial court err in determining that Mother did not commit acts of abuse, when Mother herself testified that she was abusive towards Father?

3. Did the trial court err in finding that Father would not permit frequent and continuing contact with K.G. and Mother when Father testified credibly, and presented photos with K.G. with her siblings on her Mother's side, and that he testified that he has offered for Mother and her family to see K.G. daily?

4. Did the trial court err in determining that Mother was more likely to care for K.G.'s emotional, educational, special, and other needs, when the testimony was unrebutted that Father is a good parent who has a good relationship with K.G. and cares for her immensely, while Mother has K.G. bouncing around homes and was repeatedly unclear as to where K.G. actually resides?

5. Did the trial court err in finding that Father's witnesses should not receive any weight?

6. Did the trial court err in giving Mother's testimony significant weight when Mother failed to provide any amount of supporting evidence for any claim that she made?

7. Did the trial court err in granting undue weight to Father having a 2001 conviction for simple assault when K.G. was not born until 2020?

8. Did the trial court err in determining that Father's periods of custody need to be professionally supervised where there has been no risk of harm to K.G., Mother testified that she did not believe that Father directly posed a risk of harm to K.G., and there was no credible evidence to substantiate Mother's claims of abuse or her claims that Father is in the business of distributing narcotics?

9. Did the trial court err in granting Mother sole legal custody without any basis to preclude Father from having a right to have a say in major life decisions for K.G.?

10. Did the trial court err in permitting Mother to omit medical, dental, psychological appointments, school events or conferences with teachers for K.G. from Father's knowledge?

11. Did the trial court err in precluding Father from having any phone communications with K.G. while she is in Mother's custody?

12. Did the trial court err in considering convictions that are not enumerated under 23 Pa.C.S.A. § 5329?

13. Did the trial court err in limiting Father's ability to cross-examine Mother regarding her failure to present any credible evidence to substantiate claims, despite her assertion that she had such evidence?

14. Did the trial court err in relying on facts not of record in its opinion, namely, a footnote indicating that there was an additional deputy sheriff in the courtroom?

15. Did the trial court err in determining that the parties and counsel should be subject to a supplemental order restricting the parties from speaking publicly or communicating about the

above captioned matter, violating their rights from the First Amendment of the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution?

Father's Brief at 16-18 (cleaned up, reordered for ease of disposition).[1]

When reviewing a custody order on appeal, our standard of review is well-established:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.
>
> . . .
>
> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (citations omitted).

---

[1] There are two issues that Father properly preserved, yet later explicitly withdraws in the argument section of his appellate brief. *See* Father's Brief at 33, 50 (withdrawing issues related to the court's alleged consideration of hearsay and testimony related to Father's gunshot wounds). We have omitted those questions here, as we need not address them.

We have explained, "It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, [giving] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . ." **King v. King**, 889 A.2d 630, 632 (Pa. Super. 2005) (citation omitted). This Court has recognized that "the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." **Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

We begin our review by collectively addressing Father's first four issues because they implicate the trial court's analysis pursuant to 23 Pa.C.S.A. § 5328(a). As with all custody-related matters, we reiterate that "the paramount concern of the trial court is the best interest of the child." **A.V.**, 87 A.3d at 820. To that end, Pennsylvania law provides that a court is only empowered to change an existing custody order if the modification will "serve the best interests of the child." 23 Pa.C.S.A. § 5338(a). Section 5328(a) of the Act sets forth a number of factors that a court must consider prior to modifying an existing custody order. **See E.B. v. D.B.**, 209 A.3d 451, 460

(Pa. Super. 2019). Section 5328(a) provided, at the time of the proceedings, as follows:[2]

> **(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1), and (2.2) which affect the safety of the child, including the following:
>
> (1) Which party is more likely to ensure the safety of the child.
>
> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (2.2) Violent or assaultive behavior committed by a party.
>
> (2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
>
> (8) The attempts of a parent to turn the child against the other parent, except in cases of abuse where reasonable safety

---

[2] The General Assembly has since amended the Section 5328(a) custody factors. **_See_** 23 Pa.C.S.A. § 5328 (Act of June 30, 2025, P.L. 18, No. 11, § 1, effective Aug. 29, 2025).

measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be cause by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a) (effective Aug. 13, 2024 to Aug. 28, 2025).

In order to evince proper consideration of these elements, custody courts must set forth discussion of these best-interest factors "prior to the deadline by which a litigant must file a notice of appeal." *A.V.*, 87 A.3d at 823. "It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (internal citations omitted).

- 10 -

Thus, the amount of weight a trial court gives any one factor is almost entirely discretionary. ***See id.***

In this case, the trial court accompanied the final custody order with an opinion that set forth its assessment of Section 5328(a) factors. ***See*** Opinion, 7/11/25. Specifically, the court weighed Section 5328(a)(1)-(2.2), (9)-(10), and (13) in Mother's favor. ***See id.*** at 12-15, 18-19. The court gave no weight to the factors at Section 5328(a)(7)-(8), (11), and (15). ***See id.*** at 17-18, 20. The court further found Section 5328(a)(2.3)-(6), (12), and (14) to be neutral between the parties. ***See id.*** at 15-29. With respect to Section 5328(a)(16), the court also noted its consideration of Father's prior convictions of simple assault and DUI as well as the "poor judgment" of Mother in continuing her relationship with Father despite knowing of his drug-dealing activity. ***Id.*** at 20-21. Thus, the court deemed that none of these factors favored Father's request for sole physical custody of K.G. ***See id.*** at 12-21.

Significantly, the court found the factors at Section 5328(a)(1)-(2.2), which concerned K.G.'s safety, to be determinative in this case, as follows:

> In this case, each factor that bears upon matters of safety weighed against Father. Even when confronted with other factors that may be favorable to Father, the [c]ourt cannot ignore these safety issues and must give them dispositive weight.

***Id.*** at 21; ***see also id.*** at 12-15.

Father's first four claims on appeal challenge the trial court's findings pursuant to Section 5328(a)(2.1)-(2.3) and (10). ***See*** Father's Brief at 57-64. Beginning with Section 5328(a)(2.1), which pertains to the consideration

- 11 -

of child abuse and involvement with protective services, Father contends that the court improperly weighed this factor. *See* Father's Brief at 58-60. He asserts that the court only weighed the testimony about BCCYS involvement against him and essentially ignored the related testimony regarding Mother. *See id.*

> With respect to this factor, the trial court found:
>
> Among the [BCCYS] complaints were two allegations relating to Mother's drug use. Although appearing to have some veracity, no significant action was taken by BCCYS. . . .
>
> [A] complaint was investigated by BCCYS relating to a lack of supervision of [K.G.] by Father while in his custody that resulted in an injury. BCCYS determined that this complaint was valid in that [K.G.] was injured while left unattended during a visit with Father.
>
> Considering BCCYS's involvement with this family, this factor will weigh slightly against Father due to leaving [K.G.] unattended and her suffering an injury.

Opinion, 7/11/25, at 14.

The record supports the court's findings. BCCYS caseworker Mr. Kozack testified that BCCYS investigated Mother after K.G.'s birth due to Mother testing positive for opiates. *See* N.T., 7/3/25, at 156. He stated that a safety plan was put in place for thirty days, which was then "lifted" because Mother tested negative on subsequent drug screens. *Id.* at 156-57. Mr. Kozack further testified that he investigated a report that Mother tested positive for marijuana upon the birth of another child in November of 2024. *See id.* at

159-60. He stated that BCCYS "didn't have any concerns" and closed the case. *Id.* at 160.

Regarding Father, Mr. Kozack testified that BCCYS investigated a report in March of 2021 alleging that K.G. sustained injuries while Father left her unattended during a visit. *See id.* at 154-56, 163. Mr. Kozack explained that BCCYS validated this report, which meant that BCCYS determined that the allegations were true. *See id.* at 155-56. Regarding this incident, Mother testified that K.G. fell down a flight of steps while unsupervised with Father. *See id.* at 125. Mother stated that K.G. sustained head injuries, including bruising, scratches, "a lump," as well as "a busted lip[.]" *Id.* at 125-26. Thus, we conclude that the court's findings were reasonable and supported by the record inasmuch as Father was the only party to have a validated report against him. Father's arguments related to Section 5328(a)(2.1) fail.

With respect to Section 5328(a)(2.2), which addresses violent or assaultive behavior committed by a party, Father argues that the court abused its discretion because Mother allegedly admitted that she abused Father. *See* Father's Brief at 57-58. Father asserts that "he was unfairly targeted as the abuser in this relationship while [Mother]'s actions were either overlooked or justified by the court." *Id.* at 58.

The court provided the following analysis of this factor:

This factor weighs extremely heavily against Father. Father engaged in violent and assaultive behavior repeatedly. . . .

- 13 -

> Initially, the evidence established that Father has a conviction for simple assault demonstrating that he has engaged in violent behavior with someone other than Mother. The [c]ourt was also convinced by Mother's testimony that Father was physically violent with her on multiple occasions and that when arguments became physical[,] it was Father who was the aggressor.
>
> The [c]ourt finds that Mother would fight back when Father became violent, but the [c]ourt finds this was done largely to defend herself. . . .
>
> In light of the [c]ourt finding that Father is a violent and assaultive aggressor, this factor weighs against him.

Opinion, 7/11/25, at 14-15.

The certified record undoubtedly supports the court's findings. Mother recounted an incident wherein K.G. witnessed Father physically abuse Mother at the age of one and one-half years old. *See* N.T., 7/3/25, at 119. Mother stated that during this altercation, Father punched her in the head and dragged her by her hair outside of his residence, and threw her onto the front steps. *See id.* at 120-21. Mother suffered a concussion, which required two weeks of recuperation before Mother physically recovered. *See id.* at 121.

Mother further testified that, when K.G. was approximately three years old, the parties had another argument wherein Father "grabbed" her by her hair, "pushed" her into a bedroom, and strangled her to the point where she could not breathe. *Id.* at 115-17. Mother explained that Father only stopped because Mr. Gregro came into the room. *See id.* at 117. Mother testified that the assault left her with a bald spot on her head and damage to her trachea. *See id.* at 118-19. Mother further stated that there have been

"many" additional incidents of violence perpetrated by Father in addition to these major incidents which required her hospitalization. *Id.* at 122. Mother testified that she continues to fear for her physical safety in Father's presence due to the strangulation incident. *See id.* at 123.

Father's argument pursuant to Section 5328(a)(2.2) largely depends upon his contention that Mother "admitted" she had abused him by testifying that she had occasionally fought back against his assaultive behavior by, *inter alia*, scratching his face. *See id.* at 123 ("Uh, yeah. When he has pushed me, at times, I've scratched his face."). Contrary to Father's claim, however, the court did not ignore this testimony but concluded that Mother was acting in self-defense. *See* Opinion, 7/11/25, at 14-15. Since Mother's testimony supports the trial court's findings under Section 5328(a)(2.2), we observe no basis upon which to disturb them.

Regarding Section 5328(a)(2.3), which party is more likely to encourage and permit frequent and continuing contact between the child and another party, Father argues that the court ignored his testimony that he offered to permit Mother to "visit" with K.G. during his custodial periods. Father's Brief at 61-62. Father also argues that it was essentially "unfair" for the court to expect him to be supportive of Mother in light of his limited physical custody award. *Id.*

Contrary to Father's claims, the trial court acknowledged Father's testimony, wherein he "says he is committed to allowing [K.G.] to have

- 15 -

frequent and continuous contact with Mother." Opinion, 7/11/25, at 15. Nevertheless, the court concluded that Father's words were not corroborated by actions, as "he presented no credible evidence in the form of actions that he has actually taken that the [c]ourt can rely upon to find his statements are true." *Id.* Thus, the court did not find Father's testimony concerning his support of Mother's contact with K.G. credible. *See id.*

We discern no abuse of discretion. Our review of the record confirms that there is no evidence documenting any concrete actions that Father has taken to encourage the relationship between K.G. and Mother. The only evidence provided by Father related to this factor is his confirmation that he would not prevent K.G. from speaking with Mother during his custodial time. *See* N.T., 7/3/25, at 55. Moreover, Mother stated that, despite his purported promises to permit contact between K.G. and Mother, Father does not let K.G. speak to Mother during his custodial time when he is angry with Mother. *See id.* at 130. Based upon the foregoing, the court did not abuse its discretion in weighing Section 5328(a)(2.3) neutrally between the parties. Father's arguments regarding this factor fail.

Finally, with respect to Section 5328(a)(10), which is focused upon identifying the party who is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child, Father asserts that the record evidence established that he is the party who has most consistently met K.G.'s needs. *See* Father's Brief at 63-64. He further

contends that the court abused its discretion by weighing this factor in Mother's favor because she allegedly "doesn't have a set residence" inasmuch as she resides between her mother's home and her husband's home. *Id.* at 63. Father claims that having two residences impedes Mother's ability to provide for K.G.'s needs. *See id.*

The trial court found, in relevant part, that "both parties will attend to K.G.'s physical and educational needs." Opinion, 7/11/25, at 18. However, the court found that Mother will better attend to K.G.'s emotional, developmental, and special needs because of its findings related to Father's violent and assaultive behaviors. *See id.*

The court's findings are supported by the evidence. We re-emphasize Mother's testimony with respect to the aforementioned incident wherein Father physically abused her in K.G.'s presence. *See* N.T., 7/3/25, at 119-21. To the extent Father argues that Mother cannot meet K.G.'s emotional needs because she has two residences, we are not persuaded by this argument. Mother testified that her primary residence is on Mulberry Street, which is her mother's home. *See* N.T., 7/3/25, at 174-75. Mother stated that, when she is not at the Mulberry Street home, she resides on Penn Street, which is her husband's home. *See id.* There is no record evidence, and Father points to none, to support his bald contention that having two residences negatively impacted K.G.'s physical or emotional needs. Thus, we discern no

abuse of discretion in the court weighing Section 5328(a)(10) in Mother's favor. Father's first through fourth issues merit no relief.

We next address Father's fifth, sixth, and seventh issues together because they collectively concern the weight of the evidence with respect to the testimonies of Mother, Ms. Gonzalez, and Mr. Gregro, as well as the evidence concerning Father's simple assault conviction. *See* Father's Brief at 49-50, 56-57, 64-66. Specifically, Father assails the court's heavy reliance upon his testimony regarding the simple assault conviction and Mother's testimony as a whole. *See id.* at 49-50, 64-66. Father contends that the court abused its discretion by giving no weight to the testimonies of Ms. Gonzalez and Mr. Gregro. *See id.* at 56-57.

We reiterate that the "parties cannot dictate the amount of weight the trial court places on evidence." *A.V.*, 87 A.3d at 820. Father's arguments fail because it is well-settled that, pursuant to our standard of review, we must defer to the trial court's determinations on issues of credibility and weight of the evidence. *See id.*; *see also In re R.A.M.N.*, 230 A.3d 423, 427 (Pa. Super. 2020) (the trial court "is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations[.]") (citation omitted). To the extent that Father seeks to have this Court re-weigh the testimonies of Mother, Ms. Gonzalez, and Mr. Gregro in his favor, we are precluded from doing so. *See A.V.*, 87 A.3d at 820.

Furthermore, regarding Father's simple assault conviction, we note that the trial court was mandated to consider this conviction pursuant to 23 Pa.C.S.A. § 5329(a) (listing simple assault as a charge that the court "shall consider" under the subsection). To the extent that Father argues the charge was irrelevant because it occurred before K.G.'s birth, the plain language of the Act does not restrict the compulsory considerations based upon the time a party sustains the enumerated charges. *See id.* Section 5329(a) clearly requires that Father's simple assault charge must be considered when making the custody determination, which the court did here. *See id.* Accordingly, no relief is due with respect to Father's fifth, sixth, and seventh issues.

In his eighth issue, Father argues that the court abused its discretion by ordering that his physical custody award be professionally supervised.[3] *See* Father's Brief at 35-46. Specifically, Father relies upon *Fatemi v. Fatemi*, 489 A.2d 798 (Pa. Super. 1985) to argue that supervision is "not the least restrictive means" to ensure K.G.'s safety. *Id.* at 37-38. Father contends that the record contains no "current evidence to suggest that Father is a

_____

[3] To the extent Father makes arguments related to his constitutional right to raise K.G. under the Fourteenth Amendment of the United States Constitution in his eighth through eleventh issues, he did not raise them in his concise statement of errors complained of on appeal or in his statement of questions involved in his brief. Therefore, we deem these arguments waived. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); Pa.R.A.P 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").

continuing threat" to K.G. and that there have been no incidents of abuse between the parties in several years. *Id.* at 44. Father maintains that the court improperly focused on the parties' "tumultuous history" prior to K.G.'s birth instead of their current circumstances. *Id.* at 43-44.

Section 5323(e) provides for the following considerations in relation to safety conditions for physical custody awards:

> **(e)** *Safety conditions.*
>
> **(1)** After considering the factors under [S]ections 5328, 5329 (relating to consideration of criminal conviction), 5329.1 (relating to consideration of child abuse and involvement with protective services) and 5330 (relating to consideration of criminal charge), if the court finds a history of abuse of the child or a household member by a party or a present risk of harm to the child or an abused party and awards any form of custody to a party who committed the abuse . . ., the court shall include in the custody order:
>
> > **(i)** The safety conditions, restrictions or safeguards as reasonably necessary to protect the child or the abused party.
> >
> > **(ii)** The reason for imposing the safety conditions, restrictions or safeguards, including an explanation why the safety conditions, restrictions or safeguards are in the best interest of the child or the abused party.
> >
> > **(iii)** The reasons why unsupervised physical custody is in the best interest of the child if the court finds that past abuse was committed by a party.
>
> **(2)** If supervised contact is ordered, there shall be a review of the risk of harm and need for continued supervision upon petition of the party. The safety conditions, restrictions or safeguards may include any of the following:
>
> > . . .
> >
> > **(ii)** Professional supervised physical custody.

- 20 -

. . .

**(v)** Limitations on legal custody.

23 Pa.C.S.A. § 5323(e) (effective Aug. 13, 2024).

Instantly, the trial court found that Father "has a demonstrated history of violent conduct" and "is a violent and assaultive aggressor." Opinion, 7/11/25, at 12, 15, 19. As detailed above, the court determined that Father had repeatedly committed physical abuse against Mother. *See id.* at 14-15, 19. Additionally, the court credited Mother's testimony that Father had a history of, and was actively engaged in, the illegal sale of controlled substances. *See id.* at 12, 20. The court also considered the validated BCCYS report against Father and his criminal history under Section 5329. *See id.* at 14-15, 20-21.

After considering its findings pursuant to Section 5328(a) and Section 5329, the court concluded that Father posed a present risk of harm to K.G. pursuant to Section 5323(e). *See id.* at 21-24. Therefore, the court found that safety conditions were necessary. *See id.* at 22-24. Specifically, the court determined that K.G.'s best interests mandate that Father be awarded supervised physical custody by a professional third-party. *See id.* at 23. The court also limited Father's legal custody. *See id.* at 23-24.

Contrary to Father's arguments, the record supports the court's finding that Father posed a present risk of harm to K.G. Most significantly, Mother

testified to Father's involvement in the illegal sale of controlled substances, as

follows:

> The Court: Now, when you stayed with [Father], did you see him selling drugs?
>
> A: Yes. . . . Crack cocaine, methamphetamine, marijuana sometimes. . . .
>
> . . .
>
> The Court: How long, to your knowledge, was [Father] selling drugs for a living?
>
> A: Well, he's done it all his life. He tells me that's all he knows. . . .
>
> . . .
>
> The Court: Did you see [Father's] customers come to [his] apartment?
>
> A: Yes. Um, it's not the only place that he meets them at. . . .
>
> . . .
>
> The Court: And you believe these things place [K.G.] in jeopardy?
>
> A: Absolutely.
>
> The Court: So the last time you knew that he was doing it was about two to three years ago?
>
> A: Correct.
>
> The Court: Why do you think he's still doing it?
>
> A: I wouldn't think that anything has changed if he's done it since he's . . . [fifteen]-years-old. Um, it's the only life that he knows, and aside from that, I know that he would always tell me that the SSI check that he receives isn't enough to sustain [him].

N.T., 7/3/25, at 109-12.

We have already concluded above that the court did not abuse its discretion regarding its findings related to Father's physical abuse of Mother. Father testified to his extensive criminal history, which included the following convictions: a simple assault, two DUIs, and a federal gun charge. ***See id.*** at 31-32, 63-65, 88-90, 101-02.

To the extent that Father relies upon it, we conclude that ***Fatemi*** is inapposite to the instant case. Importantly, ***Fatemi*** was decided over three decades before the controlling, current version of Section 5323(e) of the Act. ***Fatemi*** details only two methods for a court to impose restrictions on a custody award: (1) "if the parties have agreed to a restriction" or (2) "if the party requesting a restriction shows that without it, partial custody will have a detrimental impact on the child." ***Fatemi***, 489 A.2d at 801. Thus, at the time ***Fatemi*** was decided, a court was not empowered to impose safety restrictions pursuant to its independent analysis. ***See id.*** However, Section 5323(e) established that a court may impose safety restrictions, one of which can be professional supervised physical custody, upon a finding of present risk of harm to a child, which the trial court did here. ***See*** 23 Pa.C.S.A. § 5323(e).

Considering the totality of the foregoing evidence, we conclude that the court did not abuse its discretion by finding that Father posed a present risk of harm to K.G. pursuant to Section 5323(e), which necessitated his supervised physical custody award. ***See*** 23 Pa.C.S.A. § 5323(e)(2)(ii). No relief is merited.

Turning to Father's ninth and tenth issues, we address them together because they involve the trial court's legal custody determination. Father renews his arguments from his eighth issue, arguing that awarding Mother sole legal custody is an "onerous and unjustified" restriction which is unsupported by the record. Father's Brief at 37-39. He asserts that he "is essentially left to watch from afar while Mother makes all the decisions." *Id.*

These arguments merit no relief because we have already concluded that the trial court's finding that Father posed a present risk of harm to K.G. under Section 5323(e) was supported by the record. Accordingly, the court was empowered to limit Father's legal custody rights pursuant to the statute. *See* 23 Pa.C.S.A. § 5323(e)(2)(v) ("The safety conditions, restrictions or safeguards may include any of the following: . . . (v) Limitations on legal custody."). No relief is due.

Regarding Father's eleventh issue, he argues that the court abused its discretion by denying him telephone contact with K.G. while she is in Mother's physical custody. *See* Father's Brief at 41, 44-45. This argument is belied by the plain language of the final custody order, which provides the following provision with respect to telephone contact:

**8. Telephone or Other Electronic Communications with the Non-Custodial Parent**

In the absence of an extreme medical emergency as defined in Paragraph 1(d) of this final custody order, the non[-]custodial parent shall have **NO RIGHTS** to telephone or other electronic communications with [K.G.] while [K.G.] is in the custody of the other parent, *provided* nothing in this paragraph shall prohibit

> [K.G.] from requesting to communicate with the non[-]custodial parent and her request shall be honored by the custodial parent as is reasonable. In the event [K.G.] requests to communicate with the non[-]custodial parent, the non[-]custodial parent is **EXPRESSLY PROHIBITED** from compelling [K.G.] to continue the communication if [K.G.] decides it is done.

Order, 7/11/25, at 7-8 (unnecessary capitalization omitted, formatting altered, emphasis in original). As the order clearly states, Father can indeed enjoy telephone contact with K.G. during Mother's custodial time as long as K.G. requests it. *See id.* Therefore, Father's eleventh issue fails.

With respect to Father's twelfth issue, he contends that the court abused its discretion by considering his federal gun charge. *See* Father's Brief at 46-49. Our review of the record reveals that Father's testimony regarding these charges came out during Mother's *pro se* cross-examination of him. *See* N.T., 7/3/25, at 63-64. The court later questioned Father further about the details relating to these charges. *See id.* at 88-90. At the hearing, Father never raised an objection to any of this testimony. *See id.* at 63-64, 88-90. Thus, Father's twelfth issue is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

In his thirteenth issue, Father argues that the court abused its discretion in "limiting" his cross-examination of Mother. Father's Brief at 51. Specifically, Father contends that the court impeded his counsel from "attacking Mother's credibility" by stopping a cross-examination question related to Mother's lack of documentary evidence. *Id.* at 53-54.

The relevant exchange between Father's counsel and Mother is as follows:

> Q: Now, ma'am, you've made quite a few allegations against [Father] here today, and you indicated that you do not – or you did not bring proof of these because this is about [K.G.], right?
>
> A: That's correct.
>
> Q: Okay. So you didn't think it would be important to show these pictures for your daughter?[4]
>
> A: No. I did send them to [Father] on AppClose though. I'm surprised you didn't see them.
>
> Q: You didn't think it was important for the [c]ourt to see them?
>
> The Court: All right. That question is argumentative.
>
> Father's Counsel: Um-hum.
>
> The Court: Move on.

N.T., 7/3/25, at 198.

The record confirms that the court did indeed prevent Father from further pursuing this line of questioning with Mother. *See id.* Nevertheless, an erroneous evidentiary ruling is "harmless if a party does not suffer prejudice as a result of the error." *Drew v. Work*, 95 A.3d 324, 337 (Pa. Super. 2014). Upon review, we discern no prejudice suffered by Father from the exclusion of the question. In essence, the purpose of the excluded

_____

[4] When being questioned by the court, Mother referenced having photos of Father's drug-dealing activity and her injuries from the strangulation incident. *See* N.T., 7/3/25, at 109, 119.

- 26 -

question was to establish that Mother was not credible because she failed to provide pictures to the court. **See** Father's Brief at 51-54; **see also** N.T., 7/3/25, at 198. However, as previously discussed, a court is within its discretion to determine that a witness is credible solely on the basis of their testimony. **See R.A.M.N.**, 230 A.3d at 427. Therefore, we conclude that the court's exclusion of Father's counsel's question was harmless error, and Father is not entitled to relief on this claim. **See id.**

In his fourteenth issue, Father argues that the trial court abused its discretion by improperly relying upon a footnote in its opinion that discussed the presence of sheriffs in the courtroom during the trial. **See** Father's Brief at 54-56. He baldly argues that this information was outside of the record, and therefore the court's finding that Father is a "violent and assaultive aggressor" is unsupported by the record. **Id.** at 54-56.

The footnote Father takes issue with was included in the court's discussion of credibility, which, in relevant part, is as follows:

> Beginning with Father, he presents as a very severe and intense individual. During the course of the presentation of the evidence, Father stared very intensely with a look of anger on his face. He appeared very angry when Mother testified. Father's demeanor throughout the trial conformed with Mother's description of Father as an aggressive and potentially violent person.[4]
>
> [4] As a result of Father's demeanor, the [c]ourt requested that the sheriff's department add an additional sheriff to the courtroom.

Opinion, 7/11/25, at 10.

- 27 -

Observing a witness's demeanor is an essential part of the trial court's duty to assess credibility, to which we must give deference. *See A.V.*, 87 A.3d at 820 (stating that on "issues of credibility . . ., we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses."). Further, the court's opinion reveals that the at-issue footnote is related to the determination that Father was not credible, which is also squarely within its discretion. *See id.* at 10; *see also A.V.*, 87 A.3d at 820. As such, no relief is due with respect to the July 11, 2025 final custody order.

Father's fifteenth and final issue concerns the constitutionality of the trial court's gag order, which states, in relevant part:

> 1. [Father], [Mother], and their respective counsel, if any, shall NOT speak publicly or communicate about this case including, but not limited to, print or broadcast media, online or web-based communications, or inviting the public to view existing online or web-based publications.
>
> 2. Father, Mother, and their respective counsel, if any, shall NOT direct or encourage third parties to speak publicly or communicate about this case, including, but not limited to, print or broadcast media, online or web-based communications, or inviting the public to view existing online or web-based publications.
>
> 3. Father, Mother, and their respective counsel shall remove information about this case, which may have been publicly posted by Father, Mother, and their respective counsel, if any, included but not limited to any press release, any press conference, any Drop Box information, and any other online information including Facebook, Instagram, Tik Tok, Twitter/X or similar social media accessible to the public within forty-eight (48) hours of the docketing of this order. Father, Mother, and their respective counsel shall place the download or place the aforementioned

information on a thumb drive. Which shall be filed with the Office of the Prothonotary of Berks County, Pennsylvania.

4. This order is being issued based upon the court's conclusion that the restriction of the aforesaid speech furthers the important governmental interest [of] protecting the psychological and physical well-being along with the privacy of the minor child, K.G. born in May of 2020, who is at the center of this custody dispute.

Order, 7/30/25, at 1-2 (unnecessary capitalization omitted).

Father argues that the trial court abused its discretion in entering the gag order. *See* Father's Brief at 66-81. Specifically, Father contends that the gag order unconstitutionally infringes upon his rights to free speech guaranteed by the First Amendment of the United States Constitution as well as Article I, Section 7 of the Pennsylvania Constitution. *See id.*

This issue "presents questions of law for which our standard of review is *de novo* and our scope of review is plenary." *S.B. v. S.S.*, 243 A.3d 90, 104 (Pa. 2020). In examining Father's claim under the United States Constitution, we note that the First Amendment provides, in relevant part, "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. Amend. I. The free speech clause applies to the states through the Fourteenth Amendment. *See S.B.*, 243 A.3d at 104. The Pennsylvania Supreme Court has stated that "the protections afforded by the First Amendment and Article I, Section 7 are coextensive" in the context of gag orders in child custody cases. *Id.* at 113.

Our Supreme Court has explained the First Amendment right to free speech, more broadly, as follows:

It is beyond cavil that our political and cultural lives rest upon the principle, guaranteed by the First Amendment, that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence. Accordingly, the First Amendment precludes the government from restricting expression due to its message, ideas, subject matter, or content. One's constitutional right to free speech, however, while fundamental, is not absolute. Freedom of speech does not comprehend the right to speak on any subject at any time. Instead, First Amendment freedoms must be applied in light of the special characteristics of the relevant environment.

*Id.* at 104 (internal punctuation marks and citations omitted).

In his argument, Father seeks to distinguish *S.B. v. S.S.*, *supra*, wherein our Supreme Court upheld a gag order in a custody case. *See* Father's Brief at 66-81. In *S.B.*, the trial court entered a final custody order granting the father sole legal and physical custody of the parties' twelve-year-old son. *See S.B.*, 243 A.3d at 95. Thereafter, the mother and her attorney held a social media press conference about the mother's disagreement with the order, which included links to reproductions of the child's testimony regarding alleged incidents of sexual abuse. *See id.* at 96. The trial court entered a gag order, preventing the mother and her attorney from speaking publicly about the case in any way that would tend to identify the child. *See id.* at 97. The trial court made "extensive factual findings" in support of its order. *Id.* at 97-98. On appeal, the mother argued that the order infringed upon her constitutional rights to free speech. *See id.* at 100-02. The Supreme Court upheld the gag order as constitutional after determining that

it passed the applicable standard of constitutional scrutiny. *See id.* at 104-13.

In analyzing a claim involving infringement upon the First Amendment guarantee of free speech, we must first determine the nature of the speech restriction. *See id.* The *S.B.* court described the following precedent related to this analysis:

> It is well-established that content-based restrictions on speech are presumptively unconstitutional and are subject to the strict scrutiny standard, which requires the government to prove that the restrictions are narrowly tailored to serve a compelling state interest. Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed. Determining whether a particular restriction on speech is content based or content neutral is not always a simple endeavor. A restriction is content based if either the face of the regulation or the purpose of the regulation is based upon the message the speaker is conveying. To the contrary, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.
>
> . . .
>
> The High Court has explained that **the principal inquiry in determining content neutrality, in speech cases generally . . ., is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose of the speech restriction is the controlling consideration and, if the purpose is unrelated to the expression of content, the restriction is deemed neutral**, even though the speech restriction may have an incidental effect on some speakers or messages, but not others.

*Id.* at 104-06 (emphasis added; internal punctuation marks and citations omitted).

Father asserts that the instant case is distinguishable from **S.B.** insofar as there was no state interest implicated here because there was no record evidence suggesting that K.G. was harmed, or would be imminently harmed, by Father's social media posts. **See id.** at 80. Therefore, Father argues that the gag order cannot withstand constitutional muster and must be reversed. **See id.** at 79-81. We note that Mother largely agrees with Father. **See** Mother's Brief at 22-23 (stating that Father's "claims of violations of his rights to free speech, [Father] is largely correct on the law and its application.").

In its Rule 1925(a) opinion, the trial court relied upon **S.B.** in determining that its gag order was constitutional. **See** Trial Court Opinion, 9/4/25, at 53-60. The court explained that, pursuant to **S.B.**, the gag order was a content neutral restriction upon Father's speech. **See id.** at 57. We agree inasmuch as the gag order here explicitly states that its purpose is "protecting the psychological and physical well-being along with the privacy" of K.G. Order, 7/30/25, at 1-2. The **S.B.** court concluded that a gag order that was entered for the purpose of protecting the psychological well-being and privacy of a child is unrelated to the suppression of the parent's speech. **See S.B.**, 243 A.3d at 110. Because the purpose of the gag order in this case was not the result of mere disagreement with the message that Father's speech conveyed, and the purpose was unrelated to the suppression of the content of Father's speech, we deem the restriction at issue in this case to be content neutral. **See id.** at 104-06.

Accordingly, we apply the intermediate standard of constitutional scrutiny. *See id.* at 105 (explaining that "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny"). Our Supreme Court explained this standard, as follows:

> A content-neutral regulation of speech passes constitutional muster if it satisfies the following four-part standard set forth by the High Court in *United States v. O'Brien*, [391 U.S. 367 (1968)]: (1) the regulation was promulgated within the constitutional power of government; (2) the regulation furthers an important or substantial governmental interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *United States v. O'Brien*, 391 U.S. at 377.

*Id.* at 105.

With respect to the second factor, the *S.B.* court explained that it is "well-settled that protecting a minor from psychological and physical harm serves an important governmental interest, in fact, in many circumstances, a compelling state interest." *Id.* at 108 (internal citation omitted). However, the Supreme Court "clarified that state's compelling interest to protect a child in any given case, however, **is not triggered unless a court finds that a parent's speech is causing or will cause harm to a child's welfare**." *Id.* at 108-09 (citing *Shepp v. Shepp*, 906 A.2d 1165, 1173 (Pa. 2006) (emphasis added; internal quotation marks omitted). Therefore, the *S.B.* court held "that a restriction on the manner of parental speech in a custody case furthers an important governmental interest **where there is a**

- 33 -

**substantial likelihood that the restrained speech has harmed or will imminently harm the child**." *Id.* at 110 (emphasis added).

In this case, we conclude that the second *O'Brien* factor is determinative and dispositive with respect to Father's arguments. This factor necessitates that the speech restriction furthers an important or substantial governmental interest. *See id.* at 105. In *S.B.*, that trial court had made "specific factual findings, explaining that [the mother's] quest to take the custody case to the media was particularly harmful to [the c]hild and not in his best interests." *Id.* at 109. The *S.B.* Court found that the state's interest was triggered inasmuch as the "trial court's findings of harm to [the c]hild resulting from [the mother's] speech were articulate, specific, and supported by the record." *Id.* Specifically, the trial court found that the mother's speech harmed the child because the public could easily identify him as the child who "provided the graphic testimony about the alleged sexual abuse." *Id.* at 97.

We agree with Father that the instant case is critically distinguishable from *S.B.* due to the second factor of the *O'Brien* analysis. Unlike *S.B.*, the trial court in this case did not make any specific factual findings that Father's social media posts had harmed, or would imminently harm, K.G. Even if the court had made those findings, our review of the record reveals no articulate, specific evidence to support the contention that Father's at-issue speech harmed or would imminently harm K.G. Therefore, the state's interest in

restraining Father's speech was never triggered and the restriction cannot further an important governmental interest. *See S.B.*, 243 A.3d at 108-10.

Therefore, we are constrained to conclude that, on this record, the gag order fails the intermediate scrutiny standard and is unconstitutional pursuant to the First Amendment of the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution, although we acknowledge that the trial court, faced with the background of the parties, attempted to protect the child in issue from emotional harm. *See id.* at 105, 108-10, 113. Accordingly, we must reverse the gag order. Even with this holding, we commend the trial court for its comprehensive, thoughtful and  meticulous consideration of this difficult case.

Final custody order affirmed.  Gag order reversed. Jurisdiction relinquished.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary


Date: 04/27/2026